**KLOCKNER STADLER HURTER LTD., Plaintiff,**

v.

**The INSURANCE COMPANY OF the STATE OF PENNSYLVANIA, National Union Fire Insurance Company of Pittsburgh, and American International Underwriters Corporation, Defendants.**

No. 89 CIV 8063 (KC).

United States District Court, S.D. New York.

Dec. 11, 1991.

**150**

Richard B. Sypher, White & Case, New York City, for plaintiff.

Stephen J. Schlegel, Clausen Miller Gorman Caffrey & Witous, P.C., New York City, for defendants.

## MEMORANDUM AND ORDER

CONBOY, District Judge:

Defendants, the Insurance Company of the State of Pennsylvania ("ICSP"), National Union Fire Insurance Company of Pittsburgh ("NUFI"), and American International Underwriters Corporation ("AIU") move for summary judgment dismissing the remaining Counts I, II, and IV from the Plaintiff Klockner Stadler Hurter Ltd.'s ("KSH") complaint for insurance reimbursement. KSH cross-moves for partial summary judgment on Count II of its complaint.

## BACKGROUND

This action involves insurance reimbursement for losses to: 1) an excavated construction site damaged by a landslide that occurred somewhere in the vicinity of the site in August, 1985; and 2) high density storage tanks that cracked and leaked in late 1986. Unless otherwise stated, the following facts are not in dispute:

In 1981, KSH, a Canadian corporation, together with its parent company, Klockner Industrie–Anlagen, Gmbh ("KIA") and Voest–Alpine, AG, formed a joint venture known as the KVC Consortium. In 1982, the KVC Consortium entered into a contract with Sabah Forest Industries, Sdn. Bdh ("SFI"), a Malaysian company, whereby the KVC Consortium undertook to act as general contractor in the construction of the Sabah pulp and paper complex in Sipitang, Malaysia (the "Sabah Project"). The Sabah Project involved the construction of a large pulp and paper mill with related facilities, to function as a manufacturer of large quantities of paper and other products. The Sabah Project included the construction of an effluent treatment plant consisting of large concrete waste water settling pool tanks. The Sabah project also included the construction of a series of large cylindrical, high density water towers in the area of the main pulp and paper mill. The KVC Consortium, whose on-site employees supervised the Sabah Project, subcontracted portions of the construction work to several other entities.

To secure insurance for the Sabah Project, KSH, through its broker Reed Stenhouse ("RS"), negotiated on behalf of the KVC Consortium with several insuring organizations. Ultimately, RS obtained two policies of insurance relevant here. The first of these was a Contractor's All Risks/Erection All Risk Comprehensive General Liability Insurance Policy (the "CAR Policy") issued by Progressive Insurance Sdn. Bhd. ("Progressive"), a Malaysian insurance company. The second was a policy of Combined Contractor's All Risks/Erection All Risks Comprehensive General Liability Security Insurance And Difference in Conditions Policy (the "DIC Policy") issued by the Austrian branch of NUFI. RS also obtained reinsurance for the Progressive CAR Policy from ICSP in the form of a Guarantee (the "Guarantee").

During the negotiation of these policies, RS requested the establishment of a general claims handling procedure and recommended to Progressive and to AIU that the Malaysian office of Thomas Howell Kiewett ("THK") investigate and adjust all claims. ICSP, through AIU, accepted RS's recommendation in this regard, as did Progressive. Under the general claims handling procedure, KSH notified RS of any claims, and RS then reported any such claims to THK. THK investigated each such claim, advised whether coverage existed, and provided settlement amounts for each such claim. Once THK rendered such

advice, RS requested settlement payments from Progressive and from AIU.

One of the claims involved in this action concerned a slope movement that occurred somewhere in the area of the excavation site for construction of the effluent treatment plant. The initial design of the Sabah Project placed the effluent treatment plant on the same plateau as the main pulp and paper mill. Ground Engineering, Inc. a Malaysian soil testing firm hired to conduct soil borings for the entire Sabah Project, issued a report on the soil test borings. Teratech, the primary subcontracting soils consulting firm hired by the KVC Consortium for the Sabah Project, also issued a written report recommending further soil borings. As of the date of Teratech's report, the actual site of the proposed effluent treatment plant had not been finally selected. During the design process, it was decided that certain components of the effluent treatment plant should be relocated from the upper part of the plateau where the main pulp and paper mill was located to a lower part of the slope. Two soil test borings were made near the originally proposed site of the effluent treatment plant. KSH concedes that these test borings were inadequate for design and construction purposes. The excavation took place in an area where no test borings had been made.

The terrain slopes downward from the upper level of the mill site into the valley where the effluent plant was to be built. A second grading design of the slope required cutting into the natural hillside, thereby making it steeper. We note that it is unclear exactly where the excavation is located with respect to the newly graded slope [1].

The parties agree that the natural hillside had little stability because of pressure caused by the seepage of high ground water at the top of the slope, and that the upper granular soils were underlain by a layer of soft clay. KSH concedes that making the slope steeper made the slope less stable. A landslide occurred on the slope somewhere in the vicinity of the excavated site in August, 1985. The parties state that "the design and excavation of the slope were defective because they did not adequately take potential difficulties into account before the slope movement occurred." Stipulation of January 9, 1991 ("Joint Stipulation") ¶ 24. However, the parties do not stipulate whether the landslide originated at a distance from the excavation or only within the excavation itself.

The second claim in this action involves cracks and leakage in high density storage tanks located in the main plant area of the Sabah Project. The tanks were constructed of clay tile liner on the inside face of their walls. Through faulty workmanship, water was added to the concrete at some point between its original mixing and its being pumped into certain forms, thereby substantially reducing the strength of the concrete. Cracks and leakage were observed in late 1986 during hydrostatic testing once the tanks had initially been filled to about eighty percent of capacity.

After each loss, KVC made claims for the costs of "reexcavating, redesigning, and relocating" the intended site for the construction of the effluent treatment plant and of "altering and strengthening the high density water tanks in order to complete their requirements, specifications and construction." Joint Stipulation ¶¶ 30 and 36.

The KVC Consortium and RS requested the removal of THK as adjuster for the two claims at issue here because of dissatisfaction with the adjustor's progress in resolving the claims. KSH duly informed ICSP, NUFI, and AIU of the effluent treatment plant claim and the storage tank claim and sought coverage under the CAR Policy and the DIC Policy. RS agreed to the hiring of Mr. George Marschhausen of Throop & Feiden, Marschhausen to investigate these claims, and Marschhausen duly submitted his reports. By letters dated February 13, 1989, AIU, in its capacity as

---

**1.** KSH states that the excavation was at the "foot of the slope," (Memorandum of Law in Support of KSH's Motion for Partial Summary Judg-ment at 15) but the citation to Joseph Scheib's deposition testimony does not clarify the layout of the accident site.

foreign manager of ICSP, denied coverage for the effluent basin and storage tank losses under the CAR Policy. By letter dated June 14, 1989, NUFI denied coverage under the DIC Policy for the same reasons that AIU had denied coverage under the CAR Policy.

## DISCUSSION

I. *Defendants' Motion for Summary Judgment for Lack of Jurisdiction ("Defendants' Joinder" Motion)* [2]

Defendants contend that KSH's failure to name certain parties leaves the defendants' and the absent parties' interests inadequately protected. The necessary absent parties are said to be: SFI; RS; a British consortium of some of Progressive's reinsurers ("the Non–Party Reinsurers") [3]; and Progressive.

Rule 19 of the Federal Rules of Civil Procedure provides for compulsory joinder of parties who are needed for just adjudication. Fed.R.Civ.P. 19(a), which sets forth the standards for determining when a party must be joined if feasible, states in pertinent part:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

As to SFI, defendants contend that a substantial likelihood exists of a future lawsuit by SFI against Progressive and the defendants. Pointing to an assignment agreement between KIA and KSH (Defendants' Ex. 24), defendants contend that the absence of an assignment by SFI to KSH undermines our denial in our Memorandum and Order of July 11, 1990, 1990 U.S.Dist. LEXIS 8512 ("July, 1990 Order") of the defendants' previous motion to join SFI. Defendants' Joinder Memo at 3–4. In our July, 1990 Order, we based our finding that SFI lacked a direct interest in the relief sought here not on any formal assignment from SFI to KSH but rather on the understanding that KSH, not SFI, was the party "out of pocket" from the Sabah losses and therefore the real party in interest. *Id.* In addition, we found with respect to SFI: first, that there was not a substantial risk of subsequent litigation; and second, that SFI was not an indispensable party under Fed.R.Civ.P. 19(b). July 1991 Order at 5; 1990 U.S.Dist. LEXIS at \*4–9. Defendants have not controverted these findings; accordingly, their motion to join SFI is denied.

Defendants further argue that ICSP's broker, RS, has an interest in this litigation such that it must be joined as a party. Defendants contend that RS acted not only as an agent and broker for KSH during the Sabah project but also as drafter of the CAR Policy. Defendants argue that because RS drafted the CAR Policy, the rules of construction require us to interpret certain clauses of the policy against RS's principal KSH. Defendants' Joinder Memo at 5. Regardless of whether RS drafted the policy, RS's absence in this litigation does not preclude relief to those already parties or subject those already parties to multiple or inconsistent obligations. RS's purported activity as an agent and drafter may give it potential value as a witness, but this value does not

---

**2.** It is unclear why the defendants have termed their motion to dismiss for lack of jurisdiction a "summary judgment" motion. We will treat the motion as a motion to dismiss pursuant to Rules 12(b)(7) and 19 of the Federal Rule of Civil Procedure.

**3.** St. Katherine Insurance Company, P.L.C., Zurich Insurance Co. Ltd, and Palatine Insurance Company Ltd. Afft. of Yap Mun Wai ¶ 10.

necessarily give it a litigable interest. Because the defendants have not shown that RS should be joined under Fed.R.Civ.P. 19(a), we dismiss their joinder claim as to RS.

■ As to the Non–Party Insurers, defendants argue: first, that they should be joined if feasible because their absence would preclude complete relief to be accorded among those already parties; second, because they have an unprotected, direct interest in this litigation; and third, because such interest may subject those already parties to double or inconsistent obligations.

In support of their first argument, defendants merely contend that the Non–Party Reinsurers together hold a 14.085 percent of the reinsured interest in the Sabah Project. Afft. of Yap Mun Wai ¶ 9. The absence of a reinsurance party or parties with a certain share of liability does not change our inquiry as to whether ICSP and NUFI are liable to KSH for their respective shares. Therefore, this Court can accord complete relief to those already parties in the absence of the Non–Party Insurers.

As to defendants' second argument that the Non–Party Reinsurers have a direct interest in the litigation that cannot be protected in their absence, defendants contend that the substantial size of the potential liability award here "will be chargeable to the absent parties...." Defendants' Joinder Memo at 6. Fed.R.Civ.P. 19(a) speaks of a disposition that may "as a practical matter impair or impede the [absent] person's ability to protect that interest." We lack sufficient information as to the nature of the Non–Party Reinsurers' obligation to say definitively whether they have an interest in this litigation. Furthermore, we will refrain from forecasting the possible preclusive effects of this action against the Non–Party Reinsurers in what would probably be a foreign tribunal. However, we do not believe that the agreement between the Non–Party Reinsurers and Progressive could impose more reinsurance obligations upon the Non–Party Reinsurers than the broadly-worded Guarantee between ICSP and Progressive imposes upon ICSP[4]. Thus, even if the Non–Party Reinsurers have an interest in this action, ICSP can adequately protect those interests.

As for defendants' third argument that the non-Party Reinsurers have an interest in this litigation such that it leaves defendants subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations, defendants presumably believe that a future suit by KSH against the Non–Party Reinsurers could trigger an impleader motion against defendants. Even assuming that the Non–Party Insurers have an interest at stake in this litigation, and that a substantial risk to ICSP of inconsistent obligations exists, we find that the Non–Party Reinsurers are not indispensable parties under F.R.C.P. 19(b). It would not be feasible to join the Non–Party Reinsurers as parties, as they are foreign corporations whose presence could destroy our diversity jurisdiction. Therefore, as in our earlier consideration of whether this Court had jurisdiction over Progressive and SFI, we inquire as to the Non–Party Reinsurers whether "in equity and good conscience the action should proceed among the parties before the court." F.R.C.P. 19(b). We revisit the four " 'interests' that must be examined in each case to determine whether in equity and good conscience the court should proceed." *Provident Tradesmen Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109, 88 S.Ct. 733, 737, 19 L.Ed.2d 936 (1968).

"First, the plaintiff has an interest in having a forum," and thus the Court must determine "whether a satisfactory alternative forum exists." *Id.* As in their prior motion, defendants suggest that KSH should have brought suit in Malaysia, and we repeat our view that Malaysia does not

---

**4.** The Guarantee between ICSP and Progressive states in pertinent part: "This guarantee covers *pro rata* on each item, and is subject to the same risks, privileges, conditions and endorsements (except changes of location), assignments, change of interest or of rate evaluations and modes of settlement as are or may be adopted by the ceding company." Joint Stipulation, Ex. C.

appear to be a satisfactory alternative because of the uncertainty of subjecting defendants to personal jurisdiction in Malaysia. New York state courts would also not provide a satisfactory alternative because of the uncertainty of obtaining personal jurisdiction over the Non–Party Reinsurers in New York. Thus, this factor weighs in KSH's favor.

"Second, the defendant may properly wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for liability he shares with another." *Id.* Assuming *arguendo* that the defendants might be party to future litigation, we will treat this factor as if it weighs in defendants' favor.

"Third, there is the interest of the outsider whom it would have been desirable to join." *Id.* As we have found earlier, the Non–Party Insurers' interests are sufficiently protected by ICSP's presence as a party here. Finally, "there remains the interest of the courts and the public in complete, consistent and efficient settlement of controversies." *Id.* at 111, 88 S.Ct. at 739. As we have determined above, complete relief may be accorded among those already parties by maintaining them in this forum. Thus, even if the Non–Party Reinsurers should be joined as a party, and we are not convinced that they should, we find that the above interests weigh in favor of denying defendants' joinder motion as to the Non–Party Reinsurers.

The defendants' arguments about the importance of joining Progressive do not differ in substance from the arguments that we considered and ultimately rejected in defendants' earlier motion to dismiss for lack of jurisdiction. July 11, 1990 Order at 3–7; 1990 U.S.Dist. LEXIS 8512 at *4–9. We again reject these arguments, and therefore deny defendants' motion to join Progressive.

For the above reasons, we deny the defendants' motion to dismiss pursuant to Federal Rule 19.

II. *ICSP's Summary Judgment Motion to Dismiss Count I, KSH's Claim for Reinsurance Reimbursement against ICSP*

A. ICSP's Motion by Reason of Lack of Direct Right of Action

ICSP argues that KSH may not sue ICSP directly because the CAR policy requires that "settlement of loss" precede KSH's suit against a reinsurer. ICSP contends that the "plain meaning" of the CAR Policy's § 2.16(3) [5] is to make prior "settlement" of a claim a condition of the right to directly sue ICSP. Memo in Support of ICSP's Motion for Summary Judgment by Reason of Lack of Direct Right of Action ("ICSP Direct Right of Action Memo") at 2. Apparently anticipating the argument that § 2.16(3) is ambiguous, ICSP argues that the purpose of §§ 2.16(1) [6] and 2.16(3) was "to make sure that the insured had the right to proceed against a fiscally sound insurance company that they and their broker trusted in the event that Progressive proved irresponsible or unable to pay covered and allowed claims." ICSP Direct Right of Action Memo at 4. ICSP also cites part of a deposition transcript of Peter Deignan, an employee of RS, in which he states that RS knew as part of the insurance agreement that because Progressive "did not have the financial capacity to retain ... [, Progressive] would have to go to their facultative contract works reinsurers...." Deignan Depo. (Defendants' Ex. 19) at 86–87.

In the alternative, ICSP contends that we must interpret any ambiguity in the CAR Policy against KSH, since Deignan as KSH's agent allegedly drafted the policy. ICSP Direct Right of Action Memo at 4–9.

**5.** The pertinent portion of the section states that "the assignee is at liberty to collect claims, after settlement of loss, directly from reinsurers...." CAR Policy at § 2.16(3).

**6.** The assignment clause of the CAR Policy, § 2.16(1), states:

(1) The assignor assigns to the assignee all rights of service and suit and all money receivable from its reinsurers to the extent of their interest, wholly and absolutely.

ICSP further argues that a practice of settlement of claims existed during the project. ICSP contends that 87 of 89 insurance claims made by KSH during the project were "resolved." ICSP cites the affidavit of Baruch Netto, an adjuster for THK. Netto testified that 60 claims were adjusted and made subject to a THK report to the parties, 11 were below the CAR deductible, and 16 claims were withdrawn by the KVC Consortium for miscellaneous reasons. ICSP Direct Right of Action Memo at 3; Netto Afft. (Defendants' Ex. 21) ¶¶ 7–9.

In attempting to show that KSH did not in fact "settle loss," ICSP cites the deposition transcript of Netto, who recalls telling Deignan sometime between August to December, 1985 that the excavated site loss was not covered by the CAR Policy. He further recalls that Deignan "acknowledged that the Progressive Policy contained an exclusion for land but reserved agreement with [Netto's] position on coverage until he sought the advice of others in other countries." Netto further recalls telling Deignan sometime during February or March, 1987 that the tank loss was not covered by the Progressive policy, and that "Peter Deignan agreed that said claim was not covered." Netto testified that his firm "never rendered a final report on [the land slope and concrete tank claims] and was instructed to cease its work with regard to th[ese] claim[s]." Netto Afft. ¶¶ 15–19. ICSP also cites the affidavit of Mr. Muthuveeramani A/P Nadesan, the Claims Executive of Progressive, who states, "To this date, Progressive has made no settlement of loss with regard to either the land slope claim or the high density water storage tank claim, under its policy." Muthuveeramani A/P Nadesan Afft. (Defendants' Reply, Appx.) ¶ 4.

ICSP further contends that because it has not claimed any right of action against

Progressive and ICSP owes no money to Progressive under the Guarantee, KSH has no right of suit against ICSP. In other words, ICSP contends that under these circumstances, the assignment from Progressive to KSH of the right to sue Progressive's reinsurers cannot give KSH an independent right to sue ICSP. ICSP Direct Right of Action Memo at 2.

In response to ICSP's showing, KSH makes three factual contentions: first, the language of the CAR Policy does not require KSH to "settle loss" before suing the reinsurer; second, Deignan was not the sole drafter of the CAR Policy but rather drafted the policy in conjunction with Mr. Jonathan Pon, an executive of AIU; third, in any event, the DIC Policy does not require KSH to settle loss. KSH Opp. at 30.

Because we find that KSH's first factual contention satisfies its burden to show that a genuine issue of material fact exists as to whether the CAR Policy requires it to settle loss before suing ICSP, we do not find it necessary to discuss KSH's other factual contentions. Pointing to the language of the CAR Policy, KSH states that ICSP's reading of § 2.16(3) would render unnecessary § 2.16(1). KSH argues that § 2.16(3) means that where a claim has been settled, direct collection is allowed, but that where there is no settlement, direct suit is allowed.

 We find that KSH has satisfied its burden to offer evidence to rebut ICSP's contention that its interpretation of the CAR Policy is the correct one[7]. On the face of the policy alone, we find that a genuine issue of fact exists as to whether the CAR Policy's § 2.16(3) is a condition of the assignment in § 2.16(1), or whether the assignment of § 2.16(1) is absolute.

 Even consulting the parol evidence[8] and other evidence offered by ICSP, we find that further evidence is nec-

7. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538.

8. The CAR Policy states at § 2.8 that Malaysian law governs the policy's coverage of § III. The parties have each supplied the Court with applicable English and Malaysian law, which they do not dispute governs the interpretation of the policy. Accordingly, we interpret the CAR Policy as would a Malaysian Court.

Because we have found a question with respect to the sense in which a term is used, we are permitted to consider ICSP's parol evidence.

essary to clarify what the parties intended § 2.16(3) to mean. The CAR Policy's other sections that discuss "settlement of loss," §§ 2.3.2(c) and 2.4.2, appear to define the term as the payment of a claim. ICSP, however, apparently defines "settlement of loss" as the completion of a final adjuster report that might result in some resolution of the claim. Therefore, even excluding KSH's interpretation of § 2.16(3), "settlement of loss" could mean ICSP's adjustment of the amount owed 1) without actual payment of the reimbursement, 2) with some sort of compromise payment, or 3) with full payment made with some sort of provision that would avoid the possibility of double insurance. It is not clear how the parties intended their unusual assignment arrangement to work in practice[9]. Given such an ambiguity, we cannot in a summary judgment context apply the rule of *contra proferentum*[10] and we therefore do not make a finding as to which party or parties drafted the CAR Policy. Rather, we await testimony as to the intentions of the parties as to the meaning of the term "settlement of loss," whether such settlement is a condition to KSH's ability to sue ICSP, and, if so, whether such condition was fulfilled. Accordingly, we deny ICSP's motion for summary judgment by reason of lack of direct right of action.

### B. ICSP's Motion by Reason of Lack of Coverage for the Land Slope Claim[11]

ICSP contends that the excavated site loss is not a covered loss for four reasons:

first, the loss is not a "fortuity" and so is not covered; second, it is a loss to land, which is an excluded loss under the CAR policy; third, the costs of relocating and reexcavating the proposed effluent treatment plant are excluded; fourth, the loss resulted from an error in design, an excluded peril.

### 1. The Lack of Fortuity Claim

Citing British authority[12] with respect to all-risk policies such as the CAR Policy, ICSP argues that the lack of a fortuitous loss precludes recovery as a matter of law. ICSP asserts that the excavated site loss was the result of negligence and that therefore the loss was not a fortuity since it was "certain" to occur. ICSP's Memorandum of Law in Support of its Motion for Summary Judgment by Reason of Lack of Coverage for the Land Slope Claim ("ICSP Excavated Site Loss Memo") at 3–5. ICSP further contends that the Joint Stipulation confirms that at the time of the loss, KSH knew or should have known of the problems inherent in the excavation of the slope. *Id.* at 7.

Attempting to show negligence on the part of KSH, ICSP cites the Joint Stipulation statement that the excavation of the "natural hillside was marginal with respect to stability." ICSP further cites the testimony of Senior Project Engineer Joseph Scheib, who states that soil testing was not done in the area of the excavation itself;

See E.R. Hardy Ivamy, *General Principles of Insurance Law* 191 (1970).

9. ICSP in its Reply Memo at 30 has termed § 2.16(3) a "cut-through" clause, but it is not the normal "cut through" clause as defined by British authority: "A 'cut-through' clause is, broadly speaking, any term *in a reinsurance agreement,* under which the reinsurer assumes liability towards the original assured *in the event of the liquidation of the ceding company.*" John S. Butler and Robert M. Merkin, *Reinsurance Law* D.2.3–15 (Issue 12) (1991) (emphasis added). In this case, the right of direct suit originates in the insurance agreement, not in the reinsurance agreement. Moreover, neither party suggests that KSH must wait for Progressive's liquidation in order to sue it directly.

10. "[S]ummary judgment will not be granted if issues are presented involving an inquiry into the state of mind of any of the contracting parties. A typical problem involving state of mind arises when the contract terms are ambiguous so that it is necessary to determine the intent of the parties to the contract...." Charles Wright, Arthur Miller, and Mary Kane, *Federal Practice and Procedure: Civil 2d* § 2730.1 (1983).

11. KSH refers to the damage done by the landslide as the "land slope loss." Because, however, the actual claim is made for re-excavation, redesign, and relocation of the excavated site, we hereinafter refer to the "excavated site" loss or claim.

12. *E.g., British & Foreign Marine Ins. Co. v. Gaunt,* Eng.Rep. (1921).

that soil testing nearby revealed clay, high water, and surface soil conditions on the hillside; and that there was no seismic activity in the area. ICSP's Excavated Site Loss Memo at 5–6; Scheib Depo. (Defendants' Ex. 28) at 90–98, 101–102, 120–122, 129–132. Scheib further offers his opinion as an engineer that the boring was done in the wrong place and could not have revealed the true condition of the slope; that the boring should have occurred at the bottom of the valley; and that no additional boring could have uncovered the soil condition. *Id.* at 122. ICSP also cites generally the testimony of George Marschhausen, who points out shortcomings in the measurements taken before the slope movement occurred. Marschhausen Depo. (Ex. 30) ¶ 11.

In response to ICSP's showing, KSH states that the parties' stipulation does not state that KSH knew beforehand of the inadequacy of the soil boring tests. KSH Opp. at 8, n. 8. KSH also contends that Scheib's and Marschhausen's testimonies lack any statement that the slope movement was a "certainty." Finally, KSH contends that Marschhausen gave hearsay testimony and lacks personal knowledge. *Id.* at 6, n. 5.

■ The definition of a "fortuity" is an insured's loss of property or possession, "by some unexpected acts." *London Provincial Letter Processes, Ltd. v. Hudson,* 21 K.B. 724, 730. Taking the facts in the light most favorable to KSH, the non-moving party, we are unable to say that it knew or expected that the accident would occur. The parties in effect have already stipulated that the excavation site losses were due to negligence. Joint Stipulation ¶ 24. The Joint Stipulation further states at ¶ 23 that the available information, although limited, indicated the potential for slope stability problems. However, even added to the testimony of Scheib and Marschhausen [13], we cannot determine from KSH's stipulations that it *expected* the land movement to occur. As KSH sug-

gests, the stipulation does not state that KSH knew beforehand that the soil boring tests would prove inadequate. Moreover, ICSP has not alleged that the excavated site loss had already occurred before the CAR Policy was issued. Accordingly, we cannot find that the loss was a "certainty."

■ We disagree with ICSP's addition of constructive knowledge to the definition of fortuity or accident. ICSP argues that KSH "should have known" that the excavated site loss would occur, and thus that the excavated site loss was a certainty and not a fortuity. ICSP thus implicitly argues that we may impose a constructive expectation upon KSH even when a loss occurs after insurance has been issued, KSH has not intentionally caused the loss, and no evidence exists that KSH expected the loss. However, ICSP's submission of foreign law under Fed.R.Civ.P. 44.1 does not include any case law to support its implicit argument. To the contrary, the case law pointed to by both parties seems dispositive on the issue. Viscount Finlay's opinion in *Gaunt, supra,* implicitly equates the meanings of "fortuity" and "accident." *Gaunt* at 452. His opinion explains that the term "accident" includes losses caused by the negligence of one's employees. *Id.* The opinion distinguishes only the instance in which "damage was due to the wilful misconduct on the part of the assured." *Id. Gaunt* thus provides support for the proposition that subjective understanding, not constructive knowledge, is the touchstone for the definition of "fortuity" and "accident." *See also Glenlight Shipping Ltd. v. Excess Insurance Company Ltd.,* 1983 SLT 241 (rejecting argument that purely subjective mistake negates "accident" coverage).

### 2. The Land Exclusion

■ ICSP argues that the property involved in this claim comprises land, "exclusively and entirely," and so the claim is excluded by the CAR Policy's land exclusion. ICSP Excavated Site Loss Memo at

---

**13.** We will consider Marschhausen to be an expert witness for the purposes of these mo-

tions.

11. ICSP points to the CAR Policy § 3.8.1, which lists as "Property Excluded," *inter alia:* "Land, growing crops, standing timber, growing plants, shrubs, trees, lawns, except for vegetation on or adjacent to the right of way; ...." Arguing that the loss involved only damage to land, ICSP cites testimony of Scheib and Deignan. ICSP Excavated Site Loss Memo at 10. Scheib denied that KSH ever made a claim for damage to materials "of that type," because of the land movement. Scheib Depo. at 113. Deignan denied that "any physical object at the site of this land collapse and movement and bulging was changed in physical condition other than substance like mud, gravel, sand, dirt, soil, that type of substance...." Deignan Depo. at 195–196.

KSH responds that the CAR Policy's coverage of "All property and works of every kind and description except as hereinafter excluded," includes "the works damaged by the slide of the slope." KSH Opp. at 16. KSH contends that an excavation is by definition a man-made work because it is something that is formed by digging and hollowing out. It further states that it has only claimed loss for the costs of re-excavating, redesigning, and relocating the excavated site for the Treatment Plant. *Id.*

The parties appear only to dispute whether the excavated site is "land" or "work" within the meaning of the CAR Policy. We find that, as before, KSH's offering of the wording of the policy itself is sufficient to create a genuine issue of material fact as to the intentions of the contracting parties of the meaning of the contract language.

The parties appear to have intended the CAR Policy's § 3.8.1(e) to exclude damage to earth, but it is ambiguous whether this exclusion clause refers to works comprised

of earth [14]. Indeed, the listing of "growing crops, standing timber, growing plants," etc. alongside of "land" in § 3.8.1(e) shows that the contracting parties likely intended § 3.8.1(e) to exclude land only in its natural condition. At this stage in the litigation, it appears probable that the parties intended to distinguish between nature and the works that KSH would build during the construction project.

### 3. *The Alteration Exclusion*

The parties do not contest that KSH has made a claim for the costs of "re-excavating, redesigning and relocating" the intended site for the construction of the effluent treatment plant. Joint Stipulation at ¶ 25. ICSP contends that the CAR Policy § 3.8.2(b)'s exclusion of the costs of "alteration, betterment or redesign" means that it does not cover the costs of relocating and re-excavating the site of the proposed effluent treatment plant. ICSP Excavated Site Loss Memo at 17. ICSP cites the affidavit of George Marschhausen, who testified, "Relocation of the Final Clarification and Biological Step basins appears to be a substantial improvement over the original locations, considering the nature of the sloping terrain." Excavated Site Loss Memo at 18, citing Marschhausen Afft. ¶ 11.

KSH responds to ICSP's showing by first arguing that the excavated site loss is covered by the CAR Policy's §§ 3.9(a) and (d), which cover, *inter alia*, 1) the costs of arrangements to avoid construction delays following destruction to insured property and 2) removal of property endangered by an insured peril. KSH Memo at 19. KSH also argues that the term "alteration" in the CAR Policy was not intended to exclude repairs to damaged property [15]. *Id.*

---

**14.** As to the site in question, we find that it is not merely earth but rather a work made out of earth. The parties do not dispute that the excavation of the area in question had already taken place when the landslide occurred. *See* Joint Stipulation ¶ 22. The excavated area thus appears to have been not only "ground" but also a defined place, capable at least in part of accommodating certain construction, *i.e.*, a site.

**15.** In order to show that the defendants have admitted that the alteration and betterment exclusion does not apply to the *entire* amount of the losses claimed, KSH also cites the deposition testimony of AIU Executive James Beecroft: "This basis only extends to the redesign costs submitted by the insured." KSH Ex. 2 at 212. KSH cited this statement without including any of the context in which it was made. *See* KSH Opp. at 1.

We find that KSH's argument as to the meaning of the term "alteration, betterment and redesign" presents a question of fact as to these terms' application. The terms are ambiguous because it is unclear whether they refer to pre-damage change or to post-damage change. A question of fact exists as to whether the parties intended the exclusions for "alteration, betterment or redesign" to encompass pre-accident modifications made for the sake of efficiency on the one hand or post-accident improvements necessary to the completion of a project on the other.

ICSP argues that the costs of re-excavation, relocation, and redesign are merely the costs that would have been borne by KSH anyway if there had been a proper design i.e., the normal project costs of testing and alteration. ICSP Excavated Site Loss Memo at 17–18. ICSP further contends that repairs to damaged, insured property are different from redesign, alteration, or betterment. The purpose of a policy of insurance, argues ICSP, is to make an insured whole rather than better off than prior to the loss. Reply at 23. Accordingly, contends ICSP, coverage could create a never-ending cycle of payment until KSH created a proper design. Id. KSH rebuts this argument by stating that lack of coverage for alteration would deprive KSH of any insurance for repair when items fail. We find both arguments plausible [16].

### 4. The Design Exclusion

ICSP contends that the CAR Policy's exclusion of coverage of "faulty materials, casting works, error in design" at § 3.8.2 excludes coverage for the excavated site loss. ICSP cites the Joint Stipulation, which states that: the 1984 soil test borings took place on a site not eventually chosen; that no further borings occurred; that the available information indicated the potential for slope stability problems; and that faulty design resulted in the excavated site loss. Joint Stipulation ¶ 22–24. ICSP further contends that excavation continued in June, 1985 despite the discovery of clay deposit found on the second site. ICSP Excavated Site Loss Memo at 13.

Conceding the slope's design defect but not the excavated site's defect, KSH responds to ICSP by pointing to the exception to the exclusion above, i.e., that the CAR Policy would "cover all direct loss or damage due to an insured peril resulting from faulty materials, casting work, error in design...." CAR § 3.8.2(a); KSH Opp. at 13. KSH states that the excavated site loss resulted from the slope movement that damaged the excavation for the site of the treatment plant. In other words, the excavated site loss was a covered loss because it resulted from an improperly-designed slope.

We find that KSH has fulfilled its burden to offer evidence that creates a genuine issue of fact in response to ICSP's showing. The language of the CAR Policy's § 3.8.2(a) distinguishes between faulty design on the one hand and "direct loss or damage due to an insured peril resulting from faulty materials, etc." on the other; the former is excluded, the latter is covered. However, the CAR Policy lacks a definition of the term "insured peril" that allows us to apply the term to the facts before us with precision. Accordingly, the CAR Policy is ambiguous as to the following question: Assuming that the faulty design of one object (the slope) has been the primary cause of a peril that results in damage to a mistakenly-positioned second

**16.** Moreover, because neither party has taken the initial step of stating precisely what new work occurred or is planned in light of the damage claimed, we decline to speculate as to whether the costs for re-excavation in particular are excluded by the term "alteration and betterment." That is, even if the exclusion for "alteration, betterment and redesign" excludes post-accident improvement, it is unclear whether the "re-excavation" that KSH seeks occurred or will occur on a different site than the one destroyed.

We note that Joseph Scheib testified that the accident "led to a repositioning of the basins to a certain degree." Scheib Depo. at 186. However, neither party has clarified for the Court whether "re-excavation and relocation of the intended site" entails a clean-up of the destroyed site and a determination of a new site; a second excavation of the destroyed site and an excavation of new site; solely an excavation of a new site; or some other type of activity.

object (the site), is there coverage to the second object? Taking the facts in the light most favorable to KSH, the non-movant, we provisionally answer the question affirmatively.

Our interpretation of § 3.8.2(a) turns on whether coverage requires the defective grading of the slope to be the *primary* cause of the damage to the site. If so, we must then ask whether the slope was in fact the primary cause of the damage. We find the wording of the CAR Policy § 3.8.2(a) means that "resulting from" is synonymous for "primarily caused by." However, we do not know exactly what happened at the site. It appears to us that a landslide resulting from an ineffectively graded slope was *a* main cause of the damage to the excavated site. Nevertheless, we lack evidence to conclude that the inadequate testing and the consequentially mistaken decision to excavate the site where it occurred were as much causes of the damage to the site as the ineffective grading of the slope. Much of this decision would turn on evidence of chronology that is not before us.

In this case, ICSP has not shown that the primary cause of the damage to the excavated site was the mistaken decision to excavate. KSH has conceded in its Joint Stipulation that "the design of the slope *and* the excavation of the slope were both defective because they did not adequately take potential difficulties into account before the slope movement occurred." Joint Stipulation ¶ 24 (emphasis added). However, there is no showing of which cause was dominant.

Each side argues that *Sycamore Sandpits Developments Ltd. v. Phoenix Assurance Company* Q.B. (1986) supports its contention of the CAR Policy's application. In *Sycamore Sandpits*, the Court interpreted a similar policy exclusion and exception to exclusion for defective design to exclude coverage for a landslide's damage to a house's foundation. ICSP argues that the relevant holdings in *Sycamore Sandpits* were that 1) the erroneous selection of a location for a foundation—atop sloped land—was part of the faulty design pro-

cess; and 2) the land slippage was not a covered ensuing loss. ICSP Excavated Site Loss Memo at 15. ICSP cites the *Sycamore Sandpits* Court's statement that the inevitability of a foundation collapse in the site chosen strengthens the argument that the foundation was defectively designed. *Id.*

The factual record before us is insufficient to warrant a finding that *Sycamore Sandpits* is controlling. The *Sycamore Sandpits* Court rested its decision on a finding that the defective design of the foundation was the dominant cause of the foundation's collapse, or at least no less important a cause than the land slippage that occurred. *Sycamore Sandpits* at 15. In the case at hand, however, we lack sufficient evidence to point to a dominant cause of the loss.

Indeed, we find several potential and actual distinctions between the facts in *Sycamore Sandpits* and those in the record before us. The *Sycamore Sandpits* Court found that the principal defect lay in the loss item, the foundation. In our case, the new grading design of the hillside was a defect that may have been located at a distance from the site, the refurbishment of which is claimed here. Moreover, the Court in *Sycamore Sandpits* found that the inability of the foundation to support the house was due to the inadequate strength of the foundation. In our case, the excavated site was not supporting anything when the loss occurred; it is difficult to conceive of the site's being improperly designed in the same sense as was the inadequately strengthened foundation. Most importantly, in *Sycamore Sandpits*, the slope upon which the foundation was built was naturally inclined, and the Court found that the defect lay in the insufficient support of the foundation walls to support a reasonably foreseeable risk. *Sycamore Sandpits* at 7. In our case, two artificial structures existed—the newly graded hillside and the site—and the defective design of the first appears to have been a main cause in the destruction of the second. Therefore, without further evidence about

the loss that occurred here, we cannot find that *Sycamore Sandpits* is dispositive [17].

Accordingly, we deny ICSP's motion for summary judgment for reimbursement on KSH's claim for reimbursement of the excavated site loss.

### III. *ICSP's Motion for Summary Judgment on Count I By Reason of Lack of Coverage for the Storage Tank Claim*

KSH claims reimbursement for altering and strengthening the high density tanks in order to complete their design requirements, specifications, and construction. Joint Stipulation ¶ 30. ICSP has argued: first, the storage tank loss was not fortuitous: second, the loss involves faulty materials and workmanship, which are excluded perils; third, the loss involves inherent or latent defect, which are also excluded perils; fourth, the claim calls for alteration, betterment, or redesign, which are not covered.

### A. The Lack of Fortuity Claim

■■■ As argued above with respect to the excavated site loss, ICSP contends that a flaw in construction or design somehow "predestined" the storage tank leakage that followed, thus rendering the loss a certainty—not covered by insurance. *See* ICSP Memorandum in Support of Summary Judgment by reason of Lack of Coverage for the Storage Tank Claim Memo ("ICSP Storage Tank Memo") at 5–7. KSH has rebutted ICSP's showing by pointing to the lack of evidence that it knew about the construction defects before the loss occurred. KSH Opp. at 8. As we have found above, a showing either that KSH expected the tank leakage or that the leakage preceded the effective date of the policy would be necessary to raise a genuine issue of material fact as to lack of fortuity. ICSP has not made such a showing.

### B. Faulty Workmanship and Materials Claims

■■■ ICSP contends that the CAR Policy's § 3.8.2(a) exclusion of coverage for faulty workmanship and materials excludes the Storage Tank Loss. ICSP points to the Joint Stipulation, which states, "Through faulty workmanship, water was added to the concrete at some point between its original mixing and its being pumped into the forms, thereby substantially reducing the strength of the concrete." Joint Stipulation ¶ 29. ICSP also cites the deposition of Marschhausen, who states his opinion that inadequate control and supervision of the mixing and pumping of concrete contributed to the water leakage discovered in the storage tanks. Marschhausen Afft. at ¶ 19. Marschhausen explains that a substandard concrete mix resulted in the creation of various cold and defective joints. In Marschhausen's opinion, these joints prevented the erection of a continuous watertight homogenous structure. *Id.* at ¶ 18. Marschhausen further points out that one of the storage tanks was out-of-round, and that this deviation in specifications created cracking and leaking. *Id.* at ¶ 21. He also states that certain reinforcing bars were misplaced, and that this misplacement contributed to the cracking and leaking of the storage tanks. *Id.* at ¶ 20; ICSP Tank Loss Memo at 16.

KSH responds that § 3.8.2(a) covers insured losses resulting from faulty materials and workmanship even though it does not cover the fault itself. KSH Opp. at 13–15. It argues: first, that the faulty workmanship and materials led to but did not constitute the loss; and, second, that the damaged clay tile liner was not itself defective.

The parties do not dispute that while the first clause of § 3.8.2(a) excludes from coverage certain enumerated faults, the second clause covers "loss or damage due to an insured peril resulting" from these enumerated faults. The parties further do not dispute that "claim has been made for the

**17.** We further find *First Insurance Co. of Hawaii Ltd. v. Continental Casualty Company,* 466 F.2d 807 (9th Cir.1972), which has been cited by ICSP, to be of little value because, *inter alia,* it is not an English or Malaysian authority.

cost of altering and strengthening the high density water tanks in order to complete their design requirements, specifications and construction." Joint Stipulation ¶ 30.

Unfortunately, however, neither party has adequately clarified its intent as to the scope of the second clause in § 3.8.2(a) such that we may apply the clause to the tank loss with precision [18]. Moreover, the parties have not supplied the Court with an annotated diagram of the tanks themselves. Finally, as to KSH's tank claim, neither party has taken the necessary step of elaborating upon the opaque characterization of the claim in the Joint Stipulation. Without knowing whether the claim embraces the replacement of faulty workmanship, consequential damages to non-faulty workmanship, or both, we cannot determine whether coverage is excluded. Therefore, we deny summary judgment to ICSP for the tank claim as to the faulty workmanship exclusion.

### C. Latent Defect and Inherent Defect Claims

ICSP contends that the Storage Tank Loss involves "inherent or latent" defects, which are excluded by the CAR Policy's § 3.8.2(c). ICSP Storage Tank Memo at 7–13. As to inherent defect, ICSP contends that the inherent quality of the concrete caused the loss upon which KSH brings their claim. *Id.* at 10. As to latent defect, ICSP states that the "latent defect which caused the leaking and cracking of the storage tanks was the substandard concrete." *Id.* at 12. For the reasons stated in Part III.B., above, we deny summary judgment to ICSP as to the latent and inherent defect claims.

### D. Cost of Alteration, Betterment, or Redesign

The parties do not dispute that KSH claims the cost of "altering and strengthening the high density water tanks in order to complete their design requirements, specifi-

cations, and construction." Joint Stipulation ¶ 30. ICSP contends that the CAR Policy's § 3.8.2(b) exclusion of coverage of "alteration, betterment or redesign" excludes the storage tank claim. Storage Tank Memo at 18; Reply at 22. Its arguments as to the meaning of the terms "alteration, betterment, or redesign" are identical to those it makes in addressing the excavated site loss.

We have above stated our belief that § 3.8.2(b) is ambiguous. We therefore deny summary judgment on the issue of whether any other reconstruction that may be contemplated is excluded from the CAR Policy under the alteration, betterment, or redesign exclusions.

For the reasons stated above, ICSP's motion for summary judgment for the tank claim is denied.

### IV. *NUFI's Summary Judgment Motion to Dismiss Count II and KSH's Cross–Motion for Partial Summary Judgment as to Count II*

NUFI moves for summary judgment to dismiss Count II, stating that the DIC Policy excludes coverage of the entire slope and tank losses. KSH cross-moves for partial summary judgment as to Count II, arguing that the DIC Policy covers the entire excavated site and tank losses [19].

NUFI argues that the Preamble of the DIC Policy provides that coverage only occurs when the scope of coverage of the DIC Policy is greater than that of another policy, and that such extra coverage does not apply to the losses here. NUFI Memo in Support of Summary Judgment at 9; Reply at 26. The preamble states, "Coverage of this Policy applies only when such coverage is broader in meaning or scope than the coverage provided by local admitted policies of the Insured." Preamble to the DIC Policy, Part B. NUFI adopts the arguments of ICSP as to the reasons that the CAR Policy does not cover the excavated site and tank losses. NUFI Memo at 9.

---

**18.** We find the deposition testimony of AIU Executive Jonathan Pon at 270–271 to be mere speculation and, therefore, largely unhelpful to either party's position.

**19.** The parties do not dispute that Canadian law governs the interpretation of the DIC Policy.

NUFI then argues that the sole differences between the DIC and CAR Policies are that, in instances in which faulty work or inherent defects result in or are caused by insured losses, the DIC Policy extends coverage to the faulty work and defects themselves. NUFI points to the DIC Policy's § 3.8.2(a), which excepts from exclusion faulty material, workmanship, and design when any of these flaws also cause an insured loss [20]. NUFI also points to the DIC Policy's § 3.8.2(c), which excepts from exclusion latent or inherent defects that have resulted from insured losses. *Id.* at 10. NUFI contends that KSH has presented no evidence of *independent* damage to other property resulting from the faulty workmanship, faulty materials, inherent defect, or latent defect, and that such a showing is required under the DIC Policy in order for KSH to claim loss for the faults themselves. *Id.* at 12.

KSH argues that the DIC Policy's §§ 3.8.2(a) and (c) do not exclude the tank loss, and that the DIC Policy's § 3.8.1 (the land exclusion), § 3.8.2(a) (specifically the design exclusion), and § 3.8.2(b) (the alteration exclusion) do not exclude the excavated site loss. KSH Memo in Support of Summary Judgment at 26–32, 39–44. KSH acknowledges that "the primary if not the only substantive difference between the DIC Policy and the CAR Policy is that the DIC Policy contains broader coverage for faulty materials, casting, workmanship and error in design." *Id.* at 24–25.

As to the tank loss, KSH argues that the DIC Policy's § 3.8.2(a) covers the reproduction or repair of the faulty parts themselves when the faulty parts cause an insured loss and there is manifest damage to the faulty part. *Id.* at 24. KSH contends that NUFI's interpretation of § 3.8.2(a) is incorrect because it would require the towers to have collapsed onto and damaged

something else on the site, no matter how insignificant its value, before the entire loss would be covered. *Id.* at 29. KSH argues that such an interpretation in this case would effectively preclude any recovery from the DIC Policy's exceptions to the exclusions for faulty design, workmanship, and materials. *Id.* at 37–38.

As to the excavated site loss, KSH's argues that the land, faulty design, and alteration exclusions do not apply in this case. KSH's argument about the land exclusion is essentially the same as the one that KSH made in opposition to ICSP's motion above. *Id.* at 41–42. KSH also argues that the DIC Policy's exclusion for faulty design does not apply because of the exception to the exclusion in § 3.8.2(a). *Id.* at 42. Furthermore, KSH argues that the alteration clause does not apply to the excavated site loss because NUFI has not shown that *all* of the excavated site loss costs are unnecessary betterments, and therefore, NUFI has not made a complete defense. *Id.* at 44.

As a preliminary matter, we note—and the parties appear to agree—that the DIC Policy coverage only applies when it is broader than that of the CAR Policy. Such extra coverage could only be relevant here as to the DIC Policy's § 3.8.2(a) [21].

Looking to whether the DIC Policy covers faulty material, workmanship or design, we note that the language of the DIC Policy covers faulty materials, castings, workmanship, erection or error in design (collectively "faults"), in instances in which such faults cause an insured loss.

As to the storage tank loss, we find that a genuine issue of fact exists whether the faults pointed to by the NUFI may be considered distinct from the direct damage due to an insured peril. *See* Part III.B., above. We further note that that it is

---

**20.** The DIC Policy's § 3.8.2(a) states:
This section of the policy does not insure: a) Faulty materials, casting, workmanship, error in design; but this policy shall at all times cover all direct loss or damage due to an insured peril resulting from faulty materials, castings, workmanship, erection or error in design, *including the cost of reproduction or replacement of the faulty material, casting,*

*workmanship, erection or error in design.* (emphasis added).

**21.** We note that § 3.8.2(c) is in fact identical in both policies. Accordingly, § 3.8.2(c) is not implicated here, since the DIC Policy is not brought into play when coverage is the same as that afforded by the CAR Policy.

unclear precisely what loss KSH claims. *Id.* Accordingly, we deny both sides' motions as to the storage tank loss.

As to the excavated site loss, KSH has stated in the Joint Stipulation ¶ 24 that the excavation—the only claimed loss—was itself defective in part because of the mistaken choice of the site. However, for the reasons stated in Part II.B.4 above with regard to the defective slope grading, we lack sufficient evidence to say whether the defective choice of the site in fact "resulted" in the site loss [22].

For the reasons stated above, we deny NUFI's motion for summary judgment for the excavated site loss and the storage tank loss. We also deny KSH's cross-motion for partial summary judgment, holding that it has failed to produce adequate evidence implicating all the elements for coverage under the DIC Policy.

### V. *AIU's Motion for Summary Judgment Dismissing Count IV*

In response to our finding in our July 11, 1990 Order that KSH has stated a claim for estoppel against AIU, AIU argues that: first, estoppel cannot be evoked to create primary insurance liability; second, any promise would be outside the statute of frauds; third, KSH has not identified the essential terms of the alleged insurance relationship between it and AIU; fourth, KSH has not offered factual support to show a clear and ambiguous promise, a necessary element in promissory estoppel claims; and fifth, because AIU was simply a manager of ICSP's foreign claims and merely acted as an underwriter and claims processor, it cannot be estopped from denying that it was an insurer.

In response to these arguments, KSH contends that AIU was in fact an insurer because of its involvement in the negotiation and payment of losses, and thus AIU should be held liable for the losses claimed through the doctrine of estoppel.

In support of its motion, AIU contends that it merely acted as a claims handler and underwriter for ICSP, and that NUFI did not retain AIU in these positions. AIU Memorandum of Law in Support of Summary Judgment Regarding Count IV at 2, 7. AIU cites the testimonies of RS's Peter Deignan and THK's Baruch Netto. In his deposition, Deignan stated that THK adjusted all but two claims, and that these two were handled by other adjustment firms. Deignan Depo. at 114–115. He stated that the representatives of AIU never discussed that AIU would act as insurer of KSH's claims. *Id.* at 234. He also said, "I don't look upon AIU as the insurance company but rather as the manager of insurance companies." *Id.* at 237–238.

In his affidavit, Baruch Netto of THK elaborates on the history of KVC's claims report procedure. Netto's account does not refer to AIU as a participant [23].

AIU further contends that KSH has admitted that AIU was merely a manager and not an insurer because KSH has referred to AIU's capacity "as foreign manager of ICSP" in the Joint Stipulation. AIU Memo at 7.

KSH's sole argument in response to AIU's showing is that a course of dealing existed that established that "from beginning to end, AIU controlled all aspects of insurance with KSH." KSH Opp. at 33. KSH contends that AIU was responsible for the negotiation of the CAR and DIC Policies and that AIU paid KSH for losses that AIU accepted.

KSH contends that AIU negotiated the CAR and DIC Policies. KSH makes numerous citations to the affidavit of Deignan and the deposition of Jonathan Pon, an

---

**22.** We find neither KSH's evidence of prior negotiations nor its alternative arguments helpful in clarifying the issues in Count III.

**23.** Netto recalls that initially KVC made claims to RS's Malaysian affiliate, Alexander Stenhouse ("AS"), which then notified THK. In these instances, Netto "would supervise the adjuster's visit to the site for the purpose of conducting an investigation of the loss." Netto Afft. ¶ 2. After KVC made ten claims, it began notifying THK directly, and THK then notified AS. In these instances, THK visited the construction site to investigate and adjust claims and to prepare the necessary reports. THK then submitted these reports to RS's claims department in Montreal. Netto Afft. ¶ 5–6.

AIU executive. The citations to the Pon deposition show that Pon was familiar with some of the various documents apparently generated throughout the negotiation of the CAR Policy[24]. It is not clear that he was familiar with documents relating to the DIC Policy.

KSH also contends that AIU reimbursed KSH for its losses. In his deposition testimony, James Beecroft, an executive of AIU, states that RS sent new claims directly to AIU, and that he examined claims based on the information provided by THK. Beecroft Depo. at 39–40. KSH contends that if a claim called for payment, Beecroft authorized a check to be drawn on AIU's account and transmitted the check to the insured through RS. KSH Memo at 34[25]. KSH also notes that AIU wrote the letters denying the two claims necessitating the lawsuit. AIU Memo at 34, citing Joint Stipulation Exs. D and E.

As for the Joint Stipulation's reference to AIU's position of "foreign manager," KSH acknowledges the reference but notes that in Pon's deposition, Pon refers to AIU as a reinsurer and to KSH as a broker. Pon Depo. at 145.

 We find that the parties' showings raise the question of whether AIU is a risk-bearing entity for the CAR Policy such that it can be sued as an insurer. *See Cloud v. Illinois Ins. Exchange*, 701 F.Supp. 197 (W.D.Okl.1988); *Squibb–Mathieson International Corporation v. St. Paul Mercury Insurance Co.*, 254 N.Y.S.2d 586 (1964). In *Squibb–Mathieson*, the Court had to consider whether the American Foreign Insurance Association was an insurer because the plaintiff had attempted to join the association as a defendant in order to recover insurance proceeds. The plaintiff contended that the association "negotiates and effects the issuance of policies by its members and, by agreement among its members, negotiates and pays claims under these policies...." *Squibb–Mathieson* at

587. The *Squibb–Mathieson* Court's findings of fact do not clarify whether the association actually paid the insured's reimbursements. However, it was at least clear that the association's members had agreed to act as reinsurers for one another. *Id.* The Court held that the insurance association's negotiation of the policy and adjustment of claims amounted at most to brokerage. *Id.* at 588.

In *Cloud*, an insurance exchange regulated member syndicates and prepared and dispensed the syndicates' insurance policies. The syndicates' checks bore the legend of the exchange, but the funds were drawn from the syndicates' accounts. Citing *Squibb–Mathieson*, the *Cloud* court found that, without more, the exchange was not a "risk-bearing entity." *Cloud* at 199.

In our own case, KSH has presented some evidence that AIU actually paid losses for the CAR Policy from its own account. Beecroft's letters to RS describe payment of claims to KSH, apparently for the CAR Policy, and refer to "our check." These letters are evidence that AIU has represented to RS, KSH's agent, that AIU was KSH's insurer. If AIU indeed was the ultimate, consistent reimburser of losses to KSH for the CAR Policy, and this status was conveyed to KSH, then this activity would be a factor weighing in favor of our designating AIU a "risk-bearing entity" rather than a mere broker.

 We find that KSH has raised a genuine issue of material fact as to whether AIU was a risk bearing entity as to the CAR Policy. KSH has not, however, rebutted AIU's showing as to the DIC Policy. Even if the AIU negotiated the DIC Policy, the Beecroft letters pertain only to the CAR Policy. This is shown by their citations to numerically-coded claim references indicating the CAR Policy, not the DIC Policy. Thus, KSH has not offered evidence to show that AIU was a risk-bearing

---

24. *See, e.g.*, Pon Depo. (KSH Ex. 1–2) at 52–53.

25. The appendix to KSH's memorandum of law includes several letters addressed to RS that state that AIU's check is enclosed for a certain

amount in regard to a KSH loss. The heading of each letter contains a numerically-coded claim reference indicating a claim under the CAR Policy. KSH's Memo, Appx. B.

entity as to the DIC Policy. We therefore deny AIU's motion for summary judgment as to the CAR Policy but grant it as to the DIC Policy.

### CONCLUSION

In sum, we deny defendants' motion to join as parties RS, SFI, the Non–Party Reinsurers, and Progressive. With respect to Count I: We deny ICSP's motion for summary judgment by reason of lack of direct right of action; we deny ICSP's motion for summary judgment for reimbursement of the excavated site loss; and we deny ICSP's motion for summary judgment for reimbursement of the storage tank loss.

With respect to Count II: We deny NUFI's motion for summary judgment for the excavated site loss and the entire tank loss, and we deny KSH's cross-motion for partial summary judgment.

With respect to Count IV, we grant AIU's motion for summary judgment with respect to the DIC Policy and deny AIU's motion with respect to the CAR Policy.

The pretrial order in this case will be filed on February 10, 1992. The trial will commence on March 10, 1992.

SO ORDERED.